IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CERADYNE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 20-1398 (MN) |
| | ) |
| RLI INSURANCE CO. and LIBERTY | ) |
| MUTUAL INSURANCE CO., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Adam V. Orlacchio and Brandon W. McCune, BLANK ROME LLP, Wilmington, DE; James R. Murray and Kyle P. Brinkman, BLANK ROME LLP, Washington, DC; Jared Zola, BLANK ROME LLP, New York, NY. *Attorneys for Plaintiff Ceradyne, Inc.*

Robert J. Katzenstein, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, DE; John E. Howell, WILEY REIN LLP, Washington, DC. *Attorneys for Defendant RLI Insurance Co.*

Robert J. Katzenstein, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, DE; Ronald P. Schiller and Bonnie M. Hoffman, HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, Philadelphia, PA. *Attorneys for Defendant Liberty Mutual Insurance Co.*

July 26, 2021
Wilmington, Delaware

*Maryellen Noreika*
**NOREIKA, U.S. DISTRICT JUDGE**

After Defendants RLI Insurance Co. ("RLI") and Liberty Mutual Insurance Co. ("Liberty," and together with RLI, "the Excess Insurers") denied coverage, Plaintiff Ceradyne, Inc. sued for breach of contract and a declaratory judgment that the Excess Insurers are obligated to indemnify Ceradyne for a Loss based on the "Underlying Litigation," as defined below. Pending before the Court is the Excess Insurers' motion to transfer venue to the Central District of California pursuant to 28 U.S.C. § 1404(a). (D.I. 10). The motion is fully briefed. (D.I. 11; D.I. 19; D.I. 22). For the reasons set forth below, the motion to transfer is GRANTED.

## I. BACKGROUND

### 1. The Insurance Claim

Non-party National Union Fire Insurance of Pittsburgh, Pa issued Ceradyne an Executive Edge Broad Form Management Liability Insurance Policy ("the Primary Policy") for the policy period July 31, 2012 to July 31, 2013.[1] (D.I. 1 ¶ 16; D.I. 1-1 at ECF 6).

Defendant RLI is an Illinois corporation with its principal place of business in Illinois. (D.I. 1 ¶ 9). RLI issued Ceradyne an excess liability policy ("the RLI Policy") for the same July 31, 2012 to July 31, 2013 policy period as the Primary Policy. (*Id.* ¶ 17). As an excess policy, the RLI Policy provides insurance coverage "in accordance with the limitations, conditions, provisions and other terms of the Primary Policy." (D.I. 1-2 at ECF 7).

Defendant Liberty is a Massachusetts corporation with its principal place of business in Massachusetts. (D.I. 1 ¶ 10). Liberty issued Ceradyne an excess liability policy ("the Liberty Policy," and together with the RLI Policy, "the Excess Policies") for the same July 31, 2012 to

---

[1]  For reasons unclear to the Court, Ceradyne alleges that the Policy was issued by AIG (*see* D.I. 1 ¶ 16) even though the policy itself identifies National Union Fire Insurance of Pittsburgh, Pa as the insurer and not AIG (*see* D.I. 1-1 at ECF 6).

July 31, 2013 policy period as the Primary Policy. (*Id*. ¶ 18). As an excess policy, it likewise "incorporates by reference the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the Primary Policy." (D.I. 1-3 at ECF 5).

In October 2012, Ceradyne announced that it would merge with 3M. (D.I. 1 ¶ 30). Following the announcement, Ceradyne shareholders filed lawsuits against Ceradyne and its directors in the California Superior Court for Orange County. (*Id*. ¶ 31). Those actions were consolidated into the action captioned *In re Ceradyne, Inc. Shareholder Litigation*, Lead Case No. 30-2012-00604001-CU-BT-CXC ("the Underlying Litigation"). (*Id*.). In June 2017, Ceradyne settled the Underlying Litigation for $11.3 million ("the Settlement"). (*Id*. ¶¶ 3, 42). The California Superior Court gave the Settlement final approval on October 10, 2018. (D.I. 1-10).

Ceradyne seeks insurance coverage from the Excess Insurers for the "Loss" it incurred to settle the Underlying Litigation. (D.I. 1 ¶ 1). Ceradyne is a Delaware corporation. (*Id*. ¶ 8). As a result of its acquisition by 3M, Ceradyne moved its principal place of business from Costa Mesa, California to Minnesota. (*Id*.; D.I. 1-2 at ECF 4). Ceradyne obtained the Excess Policies while it was still headquartered in California from a broker located in Irvine, California. (D.I. 12-1, Ex. 1).

The Excess Policies afford coverage only for a "Loss," as that term is defined in the Primary Policy. (D.I. 1 ¶¶ 22-23). The Primary Policy defines "Loss" as follows:

> In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased ….

(*Id*. ¶ 24 (emphasis in original)). The Excess Insurers contend that the Settlement is not an indemnifiable loss because the shareholders in the Underlying Litigation repeatedly alleged that the merger consideration was inadequate and that "3M paid Ceradyne's stockholders an unfair and

2

undervalued price" in the merger between 3M and Ceradyne. (D.I. 11 at 3). According to Ceradyne, the core theory of plaintiffs in the Underlying Litigation was that Ceradyne's shareholders were deceived through allegedly false and misleading disclosures into voting for the Transaction and the defendants were, therefore, liable for breaches of their fiduciary duties. (D.I. 1 ¶ 41).

    2.    **The Standstill and Tolling Agreement**

To fully understand Ceradyne's position on the motion to transfer, the Court must digress into the details of a Standstill and Tolling Agreement ("the Standstill Agreement") and its impact on a parallel coverage action filed by the Excess Insurers in California. Between August 2017 and August 2020, the parties engaged in two mediation sessions over this coverage dispute but were unable to resolve their differences. (D.I. 1 ¶¶ 57-62).

On September 4, 2019, in between the two mediation sessions, Ceradyne and the Excess Insurers executed the Standstill Agreement. (*Id*. ¶ 63; D.I. 1-12). The agreement provides that "During the Standstill Period, no party shall initiate a lawsuit." (D.I. 1-12 § 3). The "Standstill Period" is defined as "the time period commencing on and including the Effective Date, and continuing through and including the Termination Date (if any)." (*Id*. at § 1(c)). The "Effective Date" means September 4, 2019. (*Id*. at § 1(a)). "Termination Date" means, "the date occurring sixty (60) days at 12:00 p.m. Central Time after any Party sends a written notice of intent to terminate this Agreement ('Termination Notice') to the other Party pursuant to Paragraph 4 . . . ." (*Id*. at § 1(b)).

On August 17, 2020, Ceradyne sent a Termination Notice to the Excess Insurers pursuant to Paragraph 4 of the Standstill Agreement. (D.I. 1 ¶ 60; D.I. 1-12). Thus, as Ceradyne itself alleges in the Complaint, "the 'Termination Date' pursuant to the Standstill Agreement is 12:00 pm

3

Central Time on October 16, 2020." (D.I. 1 ¶ 68). In short, the Court reads the Standstill Agreement as saying that no party shall initiate a lawsuit for the time period commencing on and including September 4, 2019 and continuing through and including 12:00 p.m. Central Time on October 16, 2020.

On October 16, 2020, the Excess Insurers filed a lawsuit against Ceradyne in the United States District Court for the Central District of California, captioned *RLI Insurance Company v. Ceradyne, Inc. et al.*, No. 8:20-cv-01997 ("the California Coverage Action"). The Excess Insurers contend, and Ceradyne does not dispute, that the filing of the complaint in the California Coverage Action complied with the timing requirements in the Standstill Agreement. (D.I. 22 at 3).

Ceradyne nevertheless contends that the California Coverage Action was filed prematurely. (D.I. 19 at 1). Notably, Ceradyne does not base this assertion on the waiting period in the Standstill Agreement. Instead, Ceradyne looks to the waiting period in the Primary Policy. According to Ceradyne, the waiting period in the Primary Policy means that "neither Ceradyne nor RLI or Liberty was permitted to 'commence a judicial proceeding' as to this dispute until after 12:00 AM at the place of filing on October 17, 2020." (D.I. 1 ¶ 69). The Primary Policy states:

> In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and *at least 60 days shall have elapsed* from the date of the termination of the mediation.

(D.I. 1-1 at ECF 69). According to Ceradyne, "the sixtieth (60th) day from termination had not 'elapsed' until the end of the day on October 16, 2020." (D.I. 1 ¶ 69).

If Ceradyne's interpretation of the waiting periods in the Standstill Agreement and the Primary Policy are correct, then the Standstill Agreement prohibits litigation before 12:00 p.m. Central Time on October 16, 2020 but the Primary Policy prohibits litigation before 12:00 a.m. on October 17, 2020. Stated succinctly, the waiting periods in the two contracts are in conflict.

4

Rather than acknowledge this conflict, Ceradyne precedes on the assumption that the waiting period in the Primary Policy supersedes the waiting period in the Standstill Agreement, even though the Primary Policy is a contract between Ceradyne and a non-party, the terms of which were incorporated into the Excess Policies through a general incorporation clause, and the Standstill Agreement was specifically negotiated and executed at a later date by the very parties whom it binds while those parties were in the middle of mediations that could foreseeably end in litigation.

Ultimately, Ceradyne's assertion as to which contract supersedes the other is a legal conclusion. In addition, because Ceradyne has not briefed this issue but instead proceeded as if its legal conclusion was correct, the Court is not in a position to evaluate its accuracy. As a result, the Court will not assume that the Excess Insurers filed the California Coverage Action prematurely in contravention of any contract terms.

### 3. The California and Delaware Coverage Actions

As stated above, the Excess Insurers filed the California Coverage Action on October 16, 2020. That same day, after receiving notice of the California Coverage Action, Ceradyne filed the Complaint in this mirror-image action ("the Delaware Coverage Action"). (D.I. 1 ¶ 71).

On November 6, 2020, the Excess Insurers filed this motion to transfer, asking the Court to transfer the Delaware Coverage Action to the same California District Court where the California Coverage Action was pending. (D.I. 10). Four days later, on November 10, 2020, Ceradyne filed a motion in the California District Court seeking a transfer of the California Coverage Action to Delaware. (*See* California Docket at D.I. 19). Ceradyne's primary argument was that the California Coverage Action should be dismissed as prematurely filed in violation of

the Primary Policies' waiting period. (*Id.*). In the alternative, Ceradyne asked the California District Court to transfer the California Coverage Action to Delaware pursuant to 28 U.S.C. § 1404(a). (*Id.*). Briefing on the motions to transfer were completed in both courts by early December 2020. (*See* D.I. 22; California Docket at D.I. 30).

On December 28, 2020, the California District Court issued a final decision granting Ceradyne's motion to transfer the California Coverage Action to Delaware ("the California Decision"). (D.I. 29-1). Thus, this Court is not writing on a clean slate when it considers the Excess Insurers' motion to transfer the Delaware Coverage Action to California. Indeed, the Court is mindful of the fact that neither the parties nor the courts benefit when a legal dispute cannot quickly and definitively settle into a venue that will decide the merits of the controversy. At the same time, however, the Court recognizes that, before it became aware of the California Coverage Action, it was inclined to transfer this action to California. Accordingly, as the Court considers the merits of the Excess Insurers' transfer motion it will also discuss the substance of the California Transfer Order and the impact that order has on the Court's decision.

## II.  DISCUSSION

Pursuant to 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district: (1) if the other district is one in which the action might have been brought or to which all the parties have consented and (2) transfer is for the convenience of the parties and witnesses and in the interests of justice. Ceradyne does not dispute that this action could have been brought in California. (*See* D.I. 19). Thus, the Court need only determine whether transfer of the Delaware Coverage Action to California is for the convenience of the parties and witnesses and in the interests of justice. To make this determination, the Court must balance several private and public interest factors. *In Re Howmedica Osteonics Corp*, 867 F.3d 390, 401 (3d Cir. 2017).

6

For courts in the Third Circuit, the private interest factors are: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the location of books and records. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). The public interest factors are: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easier, quicker, or less expensive; (3) court congestion; (4) local interest in the controversy; (5) public policies of the fora; and (6) the trial judge's familiarity with the applicable state law. *Id*.

Like here, the California District Court only had to determine whether transfer was for the convenience of the parties and witnesses and in the interests of justice. But because the California District Court sits in a different circuit, there were some differences in the number and type of factors considered. Specifically, the California District Court did not have to consider the defendant's choice of forum, where the claims arose, or the location of books and records. In addition, the California District Court did not have to consider any public interest factor except the applicable state law. Instead of weighing various public interest factors, the California District Court only had to consider "the interests of justice" broadly.

Each of the private and public interest factors considered in the Third Circuit are addressed in turn below. Where appropriate, the Court will also discuss the conclusions reached by the California District Court on those same factors.

    1.    **Plaintiff's Choice of Forum**

"It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice should not be lightly disturbed." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (internal punctuation omitted). Thus, courts "normally defer to a plaintiff's choice of forum," *Jumara*, 55 F.3d at 880, "as long as a plaintiff

7

has selected the forum for some legitimate reason." *Cypress Semiconductor Corp. v. Integrated Circuit Sys., Inc.*, No. 01-199-SLR, 2001 WL 1617186, at *2 (D. Del. Nov. 28, 2001).

Ceradyne offers three reasons why it has filed suit in Delaware – it is a Delaware corporation, Delaware law governed 3M's acquisition of Ceradyne which lead to the Underlying Litigation, and (according to Ceradyne) Delaware law should govern this dispute. (D.I. 19 at 7-8). The Court will not give any weight to the last two reasons.

First, the state of the law that governed the acquisition is irrelevant. Neither the elements of a breach of contract claim nor the choice of law principles determining which state's law governs this dispute takes into account the fact that Delaware law governed the acquisition. *See Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017) (identifying the elements of a breach of contract claim under Delaware law); *Calamos Asset Mgmt., Inc. v. Travelers Casualty & Surety Co. of Am.*, C.A. No. 18-1510 (MN), 2020 WL 3470473, at *4 (D. Del. June 25, 2020) (identifying the contacts and principles considered in resolving a choice of law dispute).

Second, even if Delaware law governs this dispute, which has not been determined, this fact is already taken into account under the public interest factor considering the "trial judge's familiarity with the applicable state law." The Court will not double count the applicable state law by also considering it here. Accordingly, the only clear connection this suit has to Delaware is that it is Ceradyne's state of incorporation.

Under these circumstances, Delaware courts have concluded that a plaintiff's choice of Delaware is entitled to deference, but "less than is generally the case." *Andrews Int'l, Inc. v. Indian Harbor Ins. Co.*, C.A. No. 12-775-LPS, 2013 WL 5461876, at *2 (D. Del. Sept. 30, 2013); *see also Express Mobile, Inc. v. Web.com Group, Inc.*, C.A. No. 19-cv-1936-RGA, 2020 WL 3971776,

at *2 (D. Del. July 14, 2020) (stating that when a plaintiff has no connection to Delaware "other than its choice to sue here and its Delaware incorporation," its choice "will still be the most important factor," but "it will not dominate the balancing to the same extent as it otherwise might"). Accordingly, the first private interest factor weighs against transfer, but it is not dispositive.[2]

### 2. Defendant's Choice of Forum

Under the second private interest factor, courts usually examine whether the defendant can articulate rational, legitimate reasons to support its preferred venue. *Pragmatus AV, LLC v. Yahoo! Inc.*, C.A. No. 11–902–LPS–CJB, 2012 WL 4889438, at *6 (D. Del. Oct. 15, 2012). Here, the Excess Insurers prefer to litigate this coverage dispute in California because that is where the Underlying Litigation took place and thus where the operative events giving rise to this action arose. The Excess Insurers have a legitimate and rational reason for their alternative forum preference. Thus, this factor weighs in favor of transfer.

### 3. Where the Claim Arose

The third factor strongly weighs in favor of transfer. Here, the parties dispute whether the Settlement of the Underlying Litigation constitutes a "Loss" under the Excess Policies issued by Excess Insurers to Ceradyne. The Excess Policies were issued to Ceradyne at its then headquarters in California through insurance brokers located in California. (D.I. 11 at 1; *see also* D.I. 12-1, Ex. 1). The Underlying Litigation that constituted the alleged "Loss" was litigated and settled in

---

[2] In the California Coverage Action, the Excess Insurers—not Ceradyne—were the plaintiff. Regardless, the California District Court gave no deference to the Excess Insurers' choice of forum. (D.I. 29-1 at 7). The court concluded that no deference was warranted because the Excess Insurers sought only declaratory relief, did not reside within the forum, and other forums in addition to California had "significant connections to the facts giving rise to the suit." (*Id*.). The other forums included Washington, D.C., New York, Illinois, and Pennsylvania, where the law firms representing the parties in this litigation reside. (*Id.* at 6 (citing California Docket D.I. 30 at 4)). Delaware was not considered as a forum with significant connections.

California. Accordingly, the claims arose in California. *See*, *e.g.*, *Andrews Int'l*, 2013 WL 5461876, at *3 (transferring action to California where the insurance policy was issued to a California policyholder and the underlying action was litigated in a California court); *see also Calamos Asset Mgmt., Inc. v. Travelers Casualty & Surety Co. of Am.*, C.A. No. 18-1510 (MN), 2019 WL 2117647, at *3 (D. Del. May 15, 2019) (claim arose in places where policies were negotiated and executed and underlying litigation leading to alleged loss occurred). Notably, the California District Court was not required to consider where the claim arose.

### 4. The Convenience of the Parties

This factor is neutral. In evaluating the convenience of the parties, the Court considers: "(1) the parties' physical location; (2) the associated logistical and operational costs to the parties' employees in traveling to Delaware (as opposed to the proposed transferee district) for litigation purposes; and (3) the relative ability of each party to bear these costs in light of its size and financial wherewithal." *Fuisz Pharma LLC v. Theranos, Inc.*, C.A No. 11–1061–SLR–CJB, 2012 WL 1820642, at *12 (D. Del. May 18, 2012).

Here, Ceradyne's headquarters are currently located in Minnesota. (D.I. 1 ¶ 8). The Excess Insurers are based in Illinois and Massachusetts. (*Id*. ¶¶ 9-10). Thus, none of the parties are currently located in either Delaware or California. All of the parties will be required to travel regardless where this litigation proceeds. In addition, the parties do not appear to be mismatched in their relative ability to bear the costs of the litigation. The California District Court likewise found this factor to be neutral. (D.I. 29-1 at 8).

### 5. The Convenience of the Witnesses

This factor weighs in favor of transfer. The Excess Insurers have identified several non-party witnesses with relevant testimony that are based in California, including Ceradyne's

California-based insurance brokers who negotiated the Excess Policies, Ceradyne's counsel for the Underlying Litigation, and California-based counsel for the plaintiffs in the Underlying Litigation.³ (*See* D.I. 11 at 9). Most of these witnesses cannot be compelled to testify at trial in Delaware. *See* Fed. R. Civ. Pro. 45(c)(1)(B) (providing that a party witness may only be compelled to testify at trial within 100 miles of their residence or, for "officers," within the state of their residence). "Although these fact witnesses may be compelled to sit for a deposition in California, this court has acknowledged that deposition testimony is not a complete substitute for live trial testimony." *Wireless Media Innovations, LLC v. LeapFrog Enters., Inc.*, No. 13-1545-SLR-SRF, 2014 WL 1203035, at *4 (D. Del. Mar. 20, 2014).

Ceradyne questions whether these witnesses will actually refuse to testify absent a subpoena and whether they really have relevant testimony that cannot be adequately substituted with documents or a videotaped deposition. (D.I. 19 at 11-15). Ultimately, Ceradyne's arguments hinge on speculation that cannot be resolved at this early stage of proceedings. It is sufficient that the Excess Insurers have specifically identified several witnesses located in California that may have relevant testimony and neither party has identified any person in Delaware that they intend to call as a witness.⁴

---

3    More specifically, those witnesses are Cameron Estey of Woodruff Sawyer, Ceradyne's insurance broker located in Irvine, California; Christine Callas, RLI's underwriter for the RLI policy in this case, located in Los Angeles California; Randall J. Baron, A. Rick Atwood, Jr., David T. Wissbroecker, and Maxwell R. Huffman of Robbins Gellar Rudman and Dowd LLP, underlying plaintiffs' counsel in the Underlying Litigation, located in San Diego California; and Marc J. Schneider, Stephen L. Ram, and Justin N. Owens of Stradling Yocca, Carlson& Rauth, P.C., defense counsel in the Underlying Litigation, located in Newport Beach, California. (D.I. 11 at 9).

4    Ceradyne does mention the name of a lawyer located in Delaware, but only to question why the Insurers have not identified him as a potential witness. (D.I. 19 at 14). Because Ceradyne itself has not identified the lawyer as a potential witness for its case, this argument seems like a straw man.

11

The California District Court found that the Excess Insurers "demonstrated some inconvenience that would result to its witnesses should the Court transfer the proceedings to the District of Delaware" but nevertheless "agree[d] with Ceradyne that possible witnesses to the instant litigation may not be harmed by transfer." (D.I. 29-1 at 9).

### 6. The Location of Books and Records

This factor is neutral. The Excess Insurers state that the relevant documents are the Policies issued to Ceradyne and documents related to the Underlying Litigation, which are available in either venue. (D.I. 11 at 12).

### 7. Enforceability of the Judgment

This factor is neutral. A judgment entered in this matter would be equally enforceable in this district as the Central District of California.

### 8. Practical Considerations

This factor is neutral. The Court must take into account "practical considerations that could make the trial easy, expeditious, or inexpensive." *Jumara*, 55 F.3d at 879. At the time this motion to transfer was filed, there was a mirror action pending in the California District Court. Thus, the Excess Insurers argued that practical considerations favored transfer, because "[t]his case can be consolidated or coordinated with the California Coverage Action, which would enhance judicial efficiency and avoid the possibility of inconsistent judgements." (D.I. 11 at 11). After the Excess Insurers filed this motion to transfer, however, the California Coverage Action was transferred to Delaware. As a result, transfer of the Delaware Coverage Action to California will no longer enhance judicial efficiency. Indeed, it would actually harm judicial efficiency because this Court would be still be left with the California Coverage Action. In this way, Ceradyne has appeared to tie the Court's hands.

Notably, this situation could have been avoided. First, when the Excess Insurers received Ceradyne's Termination Notice, it sent an email specifically asking Ceradyne to "confirm its understanding of the day and time at which the parties will be free to initiate a proceeding . . . ." (D.I. 23-1, Ex. B). Ceradyne did not responded to that email, most likely because it would have undermined Ceradyne's ability to contend in the California Coverage Action that the Excess Insurers improperly filed prematurely, a point that the California District Court found very persuasive. (*See* D.I. 29-1 (finding that the interest of justice weigh in favor of transfer because "the parties agreed to a sixty-day grace period before filing any action, which from the Court's review, RLI and Liberty seemingly ignored")).

Second, the issue of coordinating multiple-mirror actions so as to avoid the present scenario is not new to this forum. When the Delaware Court of Chancery regularly faced this problem, it asked the parties to "file motions in both (or however many) jurisdictions where [the parties] have filed suit, explicitly asking the judges in each jurisdiction to confer with one another and agree upon where the case should go forward." *In re Allion Healthcare Inc. S'holders Litig.*, C.A. No. 5022–CC, 2011 WL 1135016, at *4 (Del. Ch. Mar. 29, 2011). Here, it could have simply been a letter to the Judges in each court alerting them to the mirror motions to transfer. At that time, the Judges overseeing the mirror actions could have conferred on whether to follow or deviate from the well-established rule that when two federal courts share concurrent jurisdiction, "the court which first has possession of the subject must decide it."[5] *Riggs v. Johnson Cnty.*, 73 U.S. 166, 177 (1867); *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 976 (3d Cir. 1988) (same).

---

[5] Here, the California District Court first had possession of the subject matter because the Delaware Coverage Action was filed second in response to the filing of the California Coverage Action.

13

Given that transfer would no longer enhance judicial efficiency but may actually harm it as well as the manner in which these circumstances have arisen, this factor is at best neutral.

### 9. Court Congestion

This factor weighs in favor of transfer. The Court takes judicial notice of the most recent Judicial Caseload Profiles,[6] as of March 31, 2021, which indicate that the median length of time between filing and trial for civil cases is 28.7 months in the District of Delaware and 17.4 months in the Central District of California. The March 31, 2021 profile also indicates that District of Delaware has a higher number of pending cases per judgeship (630 cases) and percentage of civil cases over three (3) years old (12.4%) than the Central District of California (543 cases and 6.4%, respectively). Finally, this District has a higher number of weighted filings (919) than the Central California District (702). The statistics as a whole weigh in favor of transfer. *See*, *e.g.*, *W.R. Berkley Corp. v. Niemela*, No. 17-32 (GMS), 2017 WL 4081871, at *5 (D. Del. Sept. 15, 2017) ("[I]ncreased time[ ] from filing to . . . trial [is an] important factor[ ] that do[es] influence the court's calculus.").

### 10. Local Interest in the Controversy

This factor weighs in favor of transfer. Ceradyne asserts that this factor weighs against transfer because it is a Delaware corporation, Delaware law governs this dispute, and Delaware law governed the Underlying Litigation. (D.I. 19 at 17). But Ceradyne has not yet shown that Delaware law governs this dispute, as explained further below. In addition, this is an insurance coverage dispute based on a contract. It does not turn on issues related to the Delaware corporate

---

[6] *See* U.S. District Courts—Federal Court Management Statistics–Profiles—During the 12-Month Periods Ending March 31, 2016 Through 2021, available at https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2021.pdf.

14

law that governed the Underlying Litigation. This leaves Ceradyne's status as a Delaware corporation.

Although Delaware does have an interest in the controversy because Ceradyne is a Delaware corporation, "this interest is not necessarily as strong as it would be in 'litigation solely among Delaware corporations.'" *Calamos*, 2019 WL 2117647, at *5 (punctation omitted) (quoting *Harris v. Lord & Taylor LLC*, No. 18-521 (MN), 2019 WL 1854562, at *5 (D. Del. Apr. 25, 2019)). In addition, when the alleged wrongdoing occurs in another jurisdiction, this Court has recognized that the other jurisdiction has a stronger interest in deciding the dispute. *See Andrews Int'l*, 2013 WL 5461876, at *4 (concluding that California has a greater local interest in an insurance coverage dispute where only one party was a Delaware corporation and the underlying action had been litigated in California).

### 11. Public Policies of the Fora

This factor favors transfer. Ceradyne asserts that the "availability of D&O insurance serves the broader Delaware public policy behind Section 145," the Delaware statute governing indemnification and advancement of officers. (D.I. 19 at 18 (citing 8 *Del. C.* § 145)). Section 145 serves the strong Delaware public policy "to encourage capable men and women to serve as corporate directors." (*Id.* (internal punctuation omitted) (quoting *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002))).

Although Delaware clearly has a public policy interest in the capabilities and conduct of officers and directors of Delaware corporations, this public policy is not directly related to insurance coverage disputes. In addition, this policy is implemented through Delaware's state courts which are responsible for setting the legal precedents that guide the application of Section 145. In contrast, "California has a very strong interest in regulating insurance contracts entered

15

into with its own residents," which Ceradyne was at the time the policies were issued. *Are-east River Sci. Park, LLC v. Lexington Ins. Co.*, No. CV 13 01837, 2014 WL 12587051, at *6 (C.D. Cal. Mar. 27, 2014).

**12.     Familiarity with State Law**

Under this public interest factor, the Court must consider the trial judge's familiarity with the applicable state law. Complicating matters is that the parties dispute which state's law governs the Excess Policies.

Ceradyne relies on the alternative dispute resolution (ADR) provision in the Primary Policy to assert that Delaware law will govern this dispute. (D.I. 19 at 5). The ADR provision states that, "[i]n considering the construction or interpretation of the provisions of this policy, *the mediator or arbitrator(s)* must give due consideration to the general principles of the law of the State of Formation of the Named Entity." (D.I. 1-1 at ECF 24 (emphasis added)). Ceradyne's state of formation is Delaware. Thus, according to Ceradyne, Delaware law governs this contract dispute.

The Court, however, disagrees. The choice of law clause in the ADR provision does not govern this dispute, because this is a judicial proceeding, not a mediation or arbitration. *See Pfizer Inc. v. Arch Ins. Co.*, C.A. No. N18C-01-310 PRW CCLD, 2019 WL 3306043, at *6 n. 48 (Del. Super. Ct. July 23, 2019) (rejecting argument that a court deciding a breach of contract dispute must apply Delaware law because the contract contained an ADR provision requiring application of Delaware law in any arbitration or mediation).[7]

---

[7]     The *Pfizer* court did take into account the ADR provision's choice of Delaware law in conducting its overall analysis under the most significant relationship test, but the court did not use the ADR provision as a shortcut to finding that Delaware law governed the contract dispute, as Ceradyne advocates here. 2019 WL 3306043, at *6 n. 48.

16

In the absence of an express choice-of-law clause, Delaware law applies the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws ("Restatement") to determine which state's law governs a contract dispute. *Calamos*, 2020 WL 3470473, at *3. Under that test, the Court considers the following contacts:

    (a)    the place of contracting,

    (b)    the place of negotiation of the contract,

    (c)    the place of performance,

    (d)    the location of the subject matter of the contract, and

    (e)    the domicile, residence, nationality, place of incorporation and place of business of the parties.

*RSUI Indemnity Co. v. Murdock*, No. 154, 2020, 2021 WL 803867, at *6 (Del. Mar. 3, 2021) (quoting Restatement at § 188). The relative importance of these contacts is weighed in light of the overarching choice-of-law principles set forth in Restatement § 6. Those principles are:

    (a)    the needs of the interstate and international systems,

    (b)    the relevant policies of the forum,

    (c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

    (d)    the protection of justified expectations,

    (e)    the basic policies underlying the particular field of law,

    (f)    certainty, predictability and uniformity of result, and

    (g)    ease in the determination and application of the law to be applied.

*Id*. (quoting Restatement at § 6).

The Excess Insurers acknowledged that the "most significant relationship" test governs the choice of law analysis, but provided an incomplete analysis. (D.I. 11 at 10-11). The Excess Insurers indicate that the place of contracting and place of negotiation were both California, but

discussed no other contacts. (*Id.*). Ceradyne, for its part, provides no analysis at all on the most significant relationship test, stating that it is "not necessary." (*See* D.I. 19 at 15 n.8). As a result, the Court cannot determine on the record before it which state's law governs this dispute. This means, in turn, that the Court cannot make any determination regarding the trial judge's familiarity with the applicable state law. Accordingly, the Court finds that the sixth factor is neutral.

The California District Court likewise could not determine which state's law would ultimately govern this contract dispute. (D.I. 29-1 at 11). Nevertheless, the court concluded that this factor weighed against transfer, because regardless of which state's law would apply, California's choice of law rules would govern the mirror action. (*Id.*).

### 13. Balancing the Private and Public Factors

In summary, plaintiff's choice of forum weighs against transfer. Many factors weigh in favor of transfer (defendants' choice of forum, where the claims arose, the convenience of the witnesses, court congestion, the local interest, and public policies). The remaining factors are neutral. Thus, on balance, the factors support transfer.

### III. CONCLUSION

For the foregoing reasons, the Excess Insurers' motion to transfer venue to the Central District of California pursuant to 28 U.S.C. § 1404(a) (D.I. 10) is GRANTED. An appropriate order will be entered.